IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-01379-WYD-CBS

ASHER ASSOCIATES, LLC, a Colorado Limited Liability Company; and
PETRA ENERGY, a Colorado corporation,
        Plaintiffs,
v.

BAKER HUGHES OILFIELD OPERATIONS, INC., a California
corporation, d/b/a CENTRILIFT,
        Defendant.

---

## MEMORANDUM ORDER REGARDING PLAINTIFFS' MOTION FOR DETERMINATION OF SPOLIATION OF EVIDENCE AND SANCTIONS

---

Magistrate Judge Shaffer

        Plaintiffs Asher Associates, LLC and Petra Energy (collectively "Plaintiffs") have moved

Pursuant to this Court's Inherent Power to Control Litigation to Impose Sanctions for

Defendant's Spoliation of Evidence (doc. # 64) (hereinafter "Plaintiffs' Motion to Impose

Sanctions") [filed under seal].  Plaintiffs contend that Defendant Baker Hughes Oilfield

Operations, Inc. (hereinafter "Centrilift") failed to preserve and improperly destroyed two

electrical submersible pump ("ESP") systems that represent "[t]he central piece of evidence to

this litigation."[1]  Defendant Centrilift has filed a Response in Opposition (doc. # 78) [filed under

seal] and a Supplemental Response Citing Recently Taken Expert Depositions (doc. # 94).

---

[1]During the hearing on January 14, 2009, counsel for Plaintiffs stated that his clients are no longer asserting a spoliation claim as to the first electrical submersible pump employed in 2005.  *See* Transcript of January 14, 2009 Hearing, at 179-80.  Plaintiffs now concede that Defendant was not under a duty to preserve when that equipment was destroyed.

Asher Associates and Petra Energy subsequently filed a Reply in Support of Plaintiffs' Motion

(doc. # 87) [filed under seal] and a Reply to Defendant's Supplemental Response (doc. # 100).

This court held a four-hour evidentiary hearing on January 14, 2009. I have carefully

considered the parties' briefs and related exhibits, the testimony and arguments presented during

the January 14 hearing, the entire case file and the applicable case law. For the following

reasons, Plaintiffs' motion for sanctions is granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiffs initiated the instant action on or about April 17, 2007, with the filing of a

Complaint in the District Court for the City and County of Denver, Colorado. Defendant

Centrilift was formally served with the summons and Complaint on June 12, 2007, and removed

this action to federal court on June 29, 2007. The Complaint asserts claims for breach of

contract, breach of an implied covenant of good faith and fair dealing, promissory estoppel,

fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, and breach of

express warranty. On July 2, 2007, Defendant filed an Answer and Counterclaim for breach of

contract (doc. # 4).

The court will only summarize those facts or allegations pertinent to the issues raised in

the instant motion. At some point in late 2004 or early 2005, Plaintiffs decided to return to

production an oil well, designated 44-5 (hereinafter "Well 44-5"), located in the Bright Field in

Wyoming. To facilitate the resumption of production, Plaintiffs needed to remove fluids from

Well 44-5, which in turn required the use of an electrical submersible pump.[2] Plaintiffs contend

---

[2]An ESP apparently consists of four primary components: two pump sections, a seal and
a motor.

2

that, based upon representations by Centrilift's agents or employees, on February 4, 2005 they

entered into a Well Test Contract pursuant to which Plaintiffs leased an ESP and related

equipment from Defendant.[3]  *See* Defendant's Hearing Exhibit A-4.  Under the terms of that

contract, Defendant warranted that the products, materials and supplies manufactured by

Centrilift would be free from defects in material and workmanship when properly installed, used

and maintained.

> Centrilift's obligation under this warrant shall be limited to replacing or repairing
> the part or parts . . . at Centrilift's option, which prove to contain Defects,
> provided that Customer gives Centrilift notice as hereinafter provided of any
> Defects and satisfactory proof thereof . . . .  Warranty Claims by the Customer
> must be submitted to Centrilift, in writing, within sixty (60) days after the failure
> date of Products.  This limited warranty does not apply to defects in performance
> caused by hostile environments such as, but not limited to, abrasive materials . . .
> mishandling or misapplication.  Centrilift's obligations to perform Warranty
> Service under this warranty shall not apply to repairs or replacements necessitated
> by normal wear and tear or . . . for product operating in conditions for which it
> was not designed or manufactured.

*Id.* at ¶ 34.[4]

On July 7, 2005, Centrilift installed an ESP in Well 44-5 that failed within a matter of

---

[3]Documents tendered by Defendant during the January 14, 2009 hearing indicate that Plaintiffs had hired another company, ESP Wood Group, in or before 1998 to extract fluids from Well 44-5.  Apparently, those efforts resulted in submersible pump failures and other equipment problems.  As of April 23, 1998, Plaintiffs felt that the collaboration with ESP Wood Group had been "frustrating, unsuccessful and disastrously costly."  *See* Defendant's Hearing Exhibit A-02.  A former ESP Wood Group employee testified that, in his opinion, conditions within Well 44-5 caused damage to the submersible pump inserted by ESP Wood Group.  *See* Defendant's Hearing Exhibit A-49, at 7.  In 2007, Plaintiffs hired another company, Schlumberger, that also used an submersible pump to remove fluids from Well 44-5.  A Schlumberger representative has testified that his company experienced problems at Well 44-5 because of well conditions.  *See* Defendant's Hearing Exhibit A-50, at 6, 9, and 12-14.

[4]This same warranty provision was included in the Well Test Contract executed by Asher Associates and Centrilift on July 7, 2006.  *See* Defendant's Hearing Exhibit A-10.

days.  Prior to sending the first ESP into the well, Centrilift employees prepared an Install Report

that documented the condition of the ESP.  *See* Defendant's Hearing Exhibits A-5 and A-6.  On

May 10, 2006, when the first ESP was removed from Well 44-5, Centrilift employees completed

a Pull Report that noted the observed condition of the equipment.  *See* Defendant's Hearing

Exhibit A-7.  Thereafter, the first ESP was delivered to Centrilift's facility in Casper, Wyoming,

where it was dismantled and the motor and pump components were inspected and

photographed.[5] Terry Woodard, a Centrilift reliability engineer, observed that inspection and on

May 16, 2006, prepared a Rootcause Analysis Report at the request of Centrilift's sales

department.  *See* Defendant's Hearing Exhibit A-9.

As Mr. Woodard testified during the January 14, 2009 hearing, his Rootcause Analysis

Report represented an attempt to determine what happened to the first ESP after it was sent into

Well 44-5, and substantially reflected Woodard's observations during the disassembly and

inspection of the first ESP.  *See* Transcript of January 14, 2009 Hearing (doc. # 157), at 39 and

44-45.  Mr. Woodard also agreed that this process of disassembly and physical inspection "was

the best way to determine . . . what went wrong with the ESP" and "whether or not the ESP was

defective."  *Id.* at 46.  The Rootcause Analysis Report noted that stator wear had been observed

when the first ESP's motor was assembled and opined that "[w]ith the previous wear present in

the stator the [hydrogen sulfide] gas attacked the winding insulation causing the failure to the

stator."  *See* Defendant's Hearing Exhibit A-9.  But Mr. Woodard also conceded during the

---

[5]Mr. Woodard testified these photographs were subsequently sent to the sales engineer
who requested the Rootcause Analysis Report and Mr. Woodard never saw them again.  This
witness was not aware of any procedure by which those photographs would be saved.  *See*
Transcript of January 14, 2009 Hearing, at 45.

January 14 hearing that nothing in the Rootcause Analysis Report indicates if the first ESP failed while it was inside Well 44-5.  *See* Transcript of January 14, 2009 Hearing, at 78.

A second ESP was inserted into Well 44-5 on July 10, 2006, pursuant to the second Well Test Contract, and an Install Report was prepared at that time.  *See* Defendant's Hearing Exhibits A-11 and A-12.  This second ESP incorporated different motors and pumps, but recycled the seal from the first ESP.  The second ESP failed and was removed from the well on July 17, 2006, as documented in a contemporaneously prepared Pull Report.  *See* Defendant's Hearing Exhibit A-13.  Two days later, Centrilift reinserted the second ESP, but pulled the equipment from the well the next day after an failure.  *See* Defendant's Hearing Exhibits A-14 and A-15.  Shortly after July 20, 2006, the second ESP was returned to the Casper facility.  Centrilift engineers apparently never examined or photographed the component parts of the second ESP to determine if they were damaged in any way and never prepared a Rootcause Analysis Report for the second ESP. *See* Transcript of January 14, 2009 Hearing, at 47.  According to Mr. Woodard, no documentation exists today to show whether or not the second ESP was defective.  *Id.*

On August 10, 2006, Kent Wells, a Centrilift sales manager, met with Harold and Raiford Patton, Asher Associates' representatives, to discuss the situation at Well 44-5.  While the Pattons believed that any problems with the previous well tests were mechanical in nature and attributable to the equipment used by Centrilift, Mr. Wells concluded that the previous failures were caused by a hostile environment in the well itself.  *See* Transcript of January 14, 2009 Hearing, at 121.  Based on his years of experience and his review of the Pull Reports, Mr. Wells told the Pattons that Centrilift would not send an ESP down Well 44-5 for a fourth time.  *Id.* at 107, 113 and 115-18.  *See also* Defendant's Hearing Exhibit A-16.

On September 1, 2006, Asher Associates gave Centrilift written notice of a Warranty Claim pursuant to the July 7, 2006 Well Test Contract. *See* Defendant's Hearing Exhibit A-18. The September 1, 2006 letter specifically asked Centrilift "to advise us of your intentions as to Centrilifts (sic) financial obligations in this matter and intentions regarding the delivery of a serviceable, operable pump to the subject well." At that time, no one from Centrilift's Denver office advised the Casper facility that a Warranty Claim for the second ESP had been received. *See* Transcript of January 14, 2009 Hearing, at 109-110. Mr. Wells explained his decision not to request a Rootcause Analysis Report or to issue instructions to keep intact the second ESP intact after his August 10, 2006 meeting with the Pattons and after receiving Plaintiff's September 1, 2006 Warranty Claim letter:

> Being Centrilift-owned, it didn't even come across my mind for the – that was a big major factor, that it was Centrilift-owned equipment. I didn't even think to retain that. Second, back to as I stated earlier what were the reasons for the failure in my mind. Both of those combined I had no idea to save that equipment at that time.[6]

*Id.* at 130. Mr. Wells apparently felt that further investigation was not required, as he had conclusively decided that any problems were attributable to well conditions.

On September 8, 2006, Plaintiffs' outside counsel sent Centrilift and Baker Hughes, by hand delivery, Federal Express and certified mail, an unequivocal demand letter. *See* Defendant's Hearing Exhibit A-19. Counsel described the September 1, 2006 Warranty Claim as his client's attempt "to resolve this situation without litigation." In the wake of those "failed"

---

[6]Mr. Wells testified that the need for a Rootcause Analysis Report is "usually dictated by customer's concerns and/or sales concerns about performance in the particular application. So when a well is pulled, it's the salesman's responsibility if a dismantle evaluation or a failure analysis is required to get that paperwork in to the shop and engineering where they can do that." *See* Transcript of January 14, 2009 Hearing, at 114.

efforts, Asher Associates' counsel employed language that was unmistakably adversarial. Counsel claimed that Asher Associates "has been significantly damaged due to the Equipment's complete failure," provided an interim "damage calculation" and stated his "client will be seeking damages for the loss of production."  The September 8 letter warned that

> if Centrilift does not pay the Total Amount Due within five days of the date of this letter, without further notice, Asher may proceed with such legal and other action to enforce its rights, including bringing a lawsuit in Denver, Colorado for breach of contract, breach of implied covenant of good faith and fair dealing, fraud, deceit, misrepresentation, breach of express warranty and breach of implied warranty of fitness for a particular purpose.

Once again, it appears that Centrilift's Denver office made no effort to notify the Casper facility of the allegations set forth in Plaintiff's September 8 letter and did not issue instructions to preserve the second ESP.  *See* Transcript of January 14, 2009 Hearing, at 65-66 and 112.  Mr. Wells felt that such a step was not necessary because Centrilift owned the equipment in question and "in [his] mind, all three failures were the same, physical damage from the well bore to the motor lead. . . . Every single one was mashed from physical damage."  *Id.* at 112-13.

Centrilift certainly understood the import of Asher Associates' September 8 letter.  While acknowledging receipt of Plaintiffs' demand, Centrilift's response, dated September 15, 2006, "deni[ed] the claims and allegations in the letter and for the reasons provided below declin[ed] to pay any amount of money to Asher."  *See* Defendant's Hearing Exhibit A-21.  Centrilift's in-house attorney characterized all of Plaintiffs' allegations as "specious," but offered to resolve the parties' dispute by "agreeing to not collect the monies Centrilift believes it is owed from Asher in exchange for Asher allowing Centrilift to keep all monies paid to Centrilift by Asher and the execution of a mutual release of claims" between the parties.

As of September 8, 2006, the seal, motor and pumps used in the second ESP were all

located in Casper, Wyoming.  *See* Transcript of January 14, 2009 Hearing, at 50.  On September 11, 2006, the seal from the second ESP was shipped from Casper to Mexico to be scrapped.  *Id.* On May 31, 2007, after the instant lawsuit had been filed but before service was effected, the motor from the second ESP was shipped from Casper to another job site.  *Id.* at 51.  The pumps from the second ESP were dismantled on August 8 and 9, 2007 (after service on Defendant had been effected), based upon a disassembly order that was received by the Casper facility on June 6, 2007.  Some parts from the pumps were scrapped.[7]  *Id.* at 51 and 71.  There is no evidence before the court to suggest that Centrilift employees in Casper were informed of Plaintiff's threatened or pending lawsuit prior to taking these actions.

Plaintiffs filed the instant motion, arguing that sanctions are appropriate given Defendant's destruction of the second ESP used in Well 44-5 "despite the threat of impending legal action" and Centrilift's subsequent "incorrect and inconsistent explanations as to this destruction."  Asher Associates and Petra Energy contend that "[w]ithout the [second] ESP, it is difficult if not impossible to determine the exact cause of the [second] ESP's failure" and that "the ability to opine on the cause of the ESP's failure is further frustrated by the fact that Centrilift failed to perform certain tests on the ESP's component parts after pulling the [second] ESP."  *See* Plaintiffs' Motion to Impose Sanctions, at 8-9.

Defendant argues, in response, that sanctions are not warranted because "Plaintiffs cannot meet their burden of establishing a realistic possibility that having access to the Second ESP's motor or pump would be helpful to their case."  Indeed, Centrilift insists that the "the

---

[7]Mr. Woodard testified that Centrilift employees in Casper would scrap equipment because of design obsolescence, excess inventory or because of malfunction or defect.  *See* Transcript of January 14, 2009 Hearing, at 98.

evidence actually supports the opposite of what Plaintiffs contend." *See* Defendant's Response in Opposition, at 11. Defendant further argues against the imposition of sanctions because none of Plaintiffs' retained experts have indicated any inability to render options in this case because the ESPs were not available for inspection. *See* Defendant's Supplemental Response, at 2.

## ANALYSIS

Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information. *United States ex rel. Schwartz v. TRW, Inc.*, 211 F.R.D. 388, 392 (C.D. Cal. 2002). To that end, Rule 26(b) permits discovery "regarding any matter . . . that is relevant to the claim or defense of any party" or discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). *See also Williams v. Board of County Commissioners*, 192 F.R.D. 698, 702 (D. Kan. 2000) (a request for discovery should be considered relevant if there is any possibility the information sought may be relevant to a claim or defense).

To ensure that the discovery permitted by Rule 26(b)(1) does not become a futile exercise, putative litigants have a duty to preserve documents or materials that may be relevant to  potential future litigation. *See Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation"). "Spoliation" has been defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *See, e.g., West v. Goodyear Tire & Rubber Co.*,

167 F.3d 776, 779 (2d Cir. 1999).  *See also United States v. Koch Industries, Inc.*, 197 F.R.D.

463, 482 (N.D. Okl. 1998) (acknowledging a litigant's duty "to preserve evidence that it knows

or should know is relevant to imminent or ongoing litigation").

        Plaintiffs correctly note that the court has inherent power to impose sanctions for the

destruction or loss of evidence.  *See, e.g., Millsap v. McDonnell Douglas Corp.*, 162 F. Supp.2d

1262, 1309 (N.D. Okla. 2001).  *See also Procter & Gamble Co. v. Haugen*, 179 F.R.D. 622, 631

(D. Utah 1998) (recognizing a court's inherent power and authority under Fed.R.Civ.P. 37(b)(2)

to sanction a litigant "who is on notice that documents and information in its possession are

relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery

of admissible evidence, and destroys such documents and information"), *judgment aff'd in part

and rev'd in part on other grounds*, 222 F.3d 1262 (10th Cir. 2000).  "A spoliation sanction is

proper where (1) a party has a duty to preserve evidence because it knew, or should have known,

that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the

evidence."  *Burlington Northern and Santa Fe Railway Co. v. Grant,,* 505 F.3d 1013, 1032 (10th

Cir. 2007), citing *103 Investors I, L.P. v. Square D. Co.*, 470 F.3d 985, 989 (10th Cir. 2006).

        In exercising its discretion to fashion an appropriate sanction, the court must consider the

culpability of the responsible party and whether the evidence was relevant to prove an issue at

trial.  *See Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862-63 (10th Cir.

2005) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)).  To that end, this

court will apply a three-step analysis.  First, the court must determine whether the missing

second ESP would be relevant to an issue at trial.  *See United States v. $40,955.00 in United

States Currency*, 554 F.3d 752, 758 (9th Cir. 2009) ("A party does not engage in spoliation when,

without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business."). If that question is answered in the negative, the court's analysis stops there. If the missing evidence would be relevant, the court must then decide whether Centrilift was under an obligation to preserve the second ESP. Finally, if such a duty existed, the court must consider what sanction, if any, is appropriate given the non-moving party's degree of culpability, the degree of any prejudice to the moving party, and the purposes to be served by exercising the court's power to sanction.

A.      *The Relevance of the Missing ESP*

Given the claims asserted in this litigation, the relevance of the second ESP seems self-evident. *See* Fed.R.Evid. 401 ("'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). *See also United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("evidence need not be conclusive in order to be relevant"); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 220 (destroyed evidence is "relevant" for purposes of a spoliation analysis where a reasonable trier of fact could find that the evidence would support a party's claim or defense). *But see In re WRT Energy Securities Litigation*, 246 F.R.D. 185, 197 (S.D.N.Y. 2007) ("A moving party may obtain modest sanctions by showing only that the lost evidence was pertinent to its claims. However, where more severe sanctions are at issue, the movant must demonstrate that the lost information would have been favorable to it.").

Plaintiffs' Eighth Claim for Relief alleges that Centrilift breached the express warranty in the second Well Test Contract. The Well Test Contract drafted by Centrilift and executed by the

parties purports to limit Centrilift's obligations under the contract to "replacing or repairing the part or parts . . . at Centrilift's option, which prove to contain Defects." The Well Test Contract further provides that Centrilift's warranty does not extend to "defects in performance caused by hostile environments such as, but not limited to, abrasive materials . . . mishandling or misapplication" and does "not apply to repairs or replacements necessitated by normal wear and tear or . . . for product operating in conditions for which it was not designed or manufactured."[8]

Plaintiffs' September 8, 2006 letter specifically alleged that Centrilift's "employees have consistently stated that the failure of the Equipment to run as promised and contractually agreed is the fault of Centrilift and that you would remedy same." Under the circumstances, the physical condition of the second ESP and its component parts after being removed from Well 44-5 is directly relevant to the existence or non-existence of an equipment defect or Defendant's contrary assertion of adverse effects caused by the well environment. *Cf. Iowa Ham Canning, Inc. v. Handtmann, Inc.*, 870 F. Supp. 238, 242 (N.D. Ill. 1994) (in a case claiming spoliation, noted that "the physical object itself in the precise condition immediately after an accident may be more instructive and persuasive to a jury than oral or photographic descriptions").

Defendant has advanced the argument that any evidence that might be gleaned from a post-test inspection of the second ESP, and therefore access to the equipment itself, is not relevant in light of the opinions advanced by Plaintiffs' experts. One of Plaintiffs' experts,

---

[8]Centrilift requires the customer to give timely written notice of a warranty claim, as well as "satisfactory proof thereof." *See* Defendant's Hearing Exhibit A-10. It does not seem unreasonable to suggest that inspection and analysis of the second ESP might have led to the "satisfactory proof" contemplated by Centrilift's own contract. However, Plaintiff's Third Claim does not specifically cite the failure to preserve the second ESP as a breach of the implied covenant of good faith and fair dealing. The court will address the spoliation claim as actually framed in Plaintiffs' motion.

Randall Arnold, testified that in his opinion Centrilift had not properly assessed the risks of putting a 4 ½-inch ESP in Well 44-5, which allegedly had a wellbore too small for the Centrilift ESP equipment utilized.  *See* Defendant's Hearing Exhibit A-47, at 8-9.  Mr. Arnold's written report amplifies on this testimony:

> In my opinion the design of the multiple ESPs was not carefully completed nor would conform to industry standards due to the installation risk involved. . . . Centrilift did not offer [the "Canadian Tight Hole Design"] to Asher Associates and therefore did not design the best ESP for this application. . . .  I believe Asher Associates depended upon Centrilift to fully complete this design and evaluate the risks.  At that point Centrilift should have made Asher Associates aware of these risks at which time Asher Associates would have been able to make an informed decision.  With the information available for my inspection, my opinion is neither of these took place which led Asher Associates to make an uninformed decision.

*See* Defendant's Hearing Exhibit A-33, at 4.

Plaintiffs' other expert, Jim Renfro, reaches a similar conclusion regarding Centrilift's failure to properly perform its obligations under the Well Test Contract by not selecting the proper pump system for Well 44-5 and not correctly designing the ESP installation.  *See* Defendant's Hearing Exhibit A-34, at 2.  However, Mr. Renfro's written report also takes exception to Centrilift's contention that Well 44-5 involved an excessively corrosive environment which caused the pump failures.  According to Mr. Renfro's report, "this well is not an unusual or unique condition or environment," as evidenced by the fact that "[n]one of the pull reports on the three Centrilift pulls indicated any corrosion in the equipment."  *Id.*

While the opinions proffered by Plaintiffs' experts appear to be directed primarily to the Third Claim (breach of the implied covenant of good faith and fair dealing), Fifth Claim (fraudulent misrepresentation), and Seventh Claim (negligent misrepresentation), I do not believe that the limited focus of those opinions is controlling on the court's consideration of

Plaintiffs' spoliation claim.  In determining the relevance of the destroyed evidence, the court

must consider *all* of the claims and defenses in this action.

B.      *Duty to Preserve Evidence*

In most cases, the duty to preserve evidence is triggered by the filing of a lawsuit.

However, the obligation to preserve evidence may arise even earlier if a party has notice that

future litigation is likely.  *See, e.g., Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)

(the obligation to preserve evidence arises when a party should have known that the evidence

may be relevant to future litigation); *Henkel Corp. v. Polyglass USA, Inc.*, 194 F.R.D. 454, 456

(E.D.N.Y. 2000) (a party's obligation to preserve evidence arises when it has notice of the

evidence's relevance to litigation "likely to be commenced").

Weighing all of the information presented in the parties' briefs and during the January

14, 2009 hearing, I conclude that certainly by September 8, 2006, Centrilift had a duty to

preserve evidence relevant to Plaintiffs' claims.  Defendant cites my decision in *Cache La*

*Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007)*,* as support for

its assertion that Plaintiff's correspondence in September 2006 was too vague to trigger a duty to

preserve evidence.  *See* Defendant's Response in Opposition, at 6.  To the contrary, the facts in

*Cache La Poudre* are completely distinguishable.  In that case, plaintiff's counsel sent the

putative defendant successive letters over a nearly two-year period in which she reiterated her

client's desire to explore a negotiated resolution of the parties' dispute.  I concluded that the less-

than-adamant tone of counsel's letters, coupled with the lengthy passage of time, belied the

contention that Cache La Poudre's correspondence had triggered a duty to preserve evidence.

Here, the facts compel a different conclusion.  Plaintiff's letter of September 8, 2006,

came quickly on the heels of the Warranty Claim letter sent on September 1, 2008.  While the earlier letter had not specifically threatened litigation, the September 8 correspondence adopted a decidedly different and emphatic tone.  Plaintiff's outside counsel characterized the earlier letter as a "failed" attempt to resolve the dispute "without litigation."  Where Plaintiff's September 1st letter referred to "expenditures" incurred by Asher Associates in connection with Well Test Contracts, outside counsel now indicated that his client had been "significantly damaged," provided Centrilift with an "interim damage calculation," and claimed that "damages continue to accrue."  The September 8th letter demanded an "immediate payment" and imposed a five-day deadline for making that payment.[9]  Outside counsel went so far as to identify the specific claims for relief that Asher Associates would assert if it initiated "such legal or other action to enforce its rights."[10]  Given the tenor of the September 8th letter, Centrilift should have understood that future litigation was reasonably foreseeable and substantially "more than a possibility."  *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp.2d 1038, 1061 (N.D. Cal. 2006).

The lack of ambiguity in Plaintiffs' September 8th letter is confirmed in Centrilift's response dated September 15, 2006.  Centrilift had not bothered to respond in writing to Plaintiff's earlier Warranty Claim letter.  However, Centrilift in-house counsel wrote on

---

[9]These statements also must be evaluated in the wake of Mr. Well's August 10, 2006 meeting with the Pattons, during which Centrilift's representative specifically stated that his company would not send another pump down Well 44-5.

[10]The court acknowledges that Plaintiffs' letters of September 1 and 8, 2006, never specifically asked that the ESPs be preserved nor sought an opportunity to conduct their own inspection of the pumps.  Those oversights, however, do not excuse Centrilift's failure to preserve relevant evidence.  *Cf. Thompson v. United States Department of Housing and Urban Development*, 219 F.R.D. 93, 100 (D. Md. 2003) (holding that a party's failure to request the preservation of documents "does not vitiate the independent obligation of an adverse party to preserve such information").

September 15 that his client "denies the claims and allegations" raised by Plaintiffs and "declines to pay any amount of money to Asher."

C.     Intent

Common sense suggests that a failure to produce or preserve relevant evidence may involve conduct that falls "along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002). *See also Anderson v. Cryovoc, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988) ("[n]ondisclosure comes in different shapes and sizes; it may be accidental or inadvertent, or considerably more blameworthy"); *Minter v. Prime Equipment Co.*, 2007 WL 2703093, *3 (E.D. Okla. 2007) (recognizing that "spoliation occurs with varying degrees of culpability").

In *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997), the Tenth Circuit held that "the bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." In the same decision, the Tenth Circuit further reasoned that no adverse inference should arise where the destruction of a document resulted from mere negligence, because only bad faith would support an "inference of consciousness of a weak case."[11] *Id. See also Henning v. Union Pacific Railroad Co.*, 530 F.3d 1206,1219-20 (10th Cir. 2008). Of course, in cases where an adverse inference instruction is neither requested nor appropriate, the Tenth

---

[11]"'Bad faith' is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Attorneys Title Guaranty Fund v. Goodman*, 179 F. Supp.2d 1268, 1277 (D. Utah 2001).

Circuit has held that a finding of bad faith is not required to impose non-dispositive sanctions, such as excluding evidence. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d at 988-89. *See also Jordan F. Miller Corp. v. Mid-Continental Aircraft Service, Inc.*, 139 F.3d 912 (Table) (10th Cir. (Okla. 1998).

After carefully reviewing the record presented by the parties, I conclude that Centrilift's failure to preserve the second ESP was the product of negligence or carelessness, but not bad faith. It is undisputed that the second ESP is no longer intact and many of its primary components have been scrapped in whole or in part. There is no evidence, however, that would support a finding that the disposition of those parts was motivated by bad faith or willfulness on the part of Centrilift and its employees. Without question, the parties had diametrically opposed views on why the well tests failed.[12] That difference of opinion, without more, does not suffice to establish bad faith.

Testimony elicited at the January 14 hearing revealed that during the relevant time period, Centrilift did not have a standard protocol for handling equipment returned to the Casper facility. *See* Transcript of January 14, 2009 Hearing, at 47 and 56. The disposition of returned equipment would depend upon the condition and value of the inventory, and whether the returned equipment could be used on another job. *Id.* at 56-57. Centrilift's Well Test Contract gives the customer 60-days to provide written notice of a warranty claim. However, Mr. Woodard was not aware of measures that Centrilift takes to ensure that subject equipment remains available during that 60-day period. Woodard acknowledged that equipment pulled

---

[12]As Mr. Well's conceded during the January 14, 2009 hearing, he had concluded that the second ESP failure should be attributed to a hostile well environment, while the Pattons felt that the cause was equipment failure. *See* Transcript of January 14, 2009 Hearing, at 120-21.

from a well could be returned to Casper for inspection and testing, and then immediately sent to

another job site before the 60-day window for submitting a warranty claim had expired.  *Id.* at

58-59.  According to Woodard, the Casper facility normally will prepare a disassembly and

inspection report before equipment is sent back out into the field for use.  *Id.* at 59-62.[13]

     While not dispositive of the issue of intent or bad faith, I also note that Plaintiffs' letters

to Centrilift in September 2006 did not request an opportunity to inspect the second ESP or a

demand that the second ESP be preserved.  This omission is notable, particularly since the

Pattons knew after the August 10 meeting with Kent Wells that Centrilift took the position that

any failures with the second well test were caused by well conditions and not equipment defects.

Destruction of equipment in the wake of affirmative requests to preserve and/or inspect would

have cast Centrilift's conduct in an entirely different light.

D.     *Appropriate Sanctions*

     During the January 14 hearing, Plaintiffs' counsel addressed his clients' claim of

prejudice.

> We don't know the unknown.  What we know is that we've got a second – a
> second ESP – pumps in a second ESP with parts that are scrapped that are not
> typically scrapped.  We don't know why.  Nobody can answer the question why.
> So we have a product that has indications that it's got defective parts that nobody
> can explain why.  Our experts couldn't possibly. . . .  Our experts are formulating
> their opinions based on a root cause analysis report that's done on the first ESP.
> If one had been done on the second ESP as detailed as Mr. Woodard had provided
> for the first ESP, then our experts – you know, we may have some prejudice here

---

[13]The second ESP's motor "passed" inspection prior to being shipped from the Casper
facility on May 31, 2007.  *See* Defendant's Hearing Exhibit A-28.  A disassembly and inspection
report was not prepared for the seal from the second ESP apparently because that component was
sent to Mexico to be scrapped.  During the January 14 hearing, Mr. Woodard was questioned
about the contents of a disassembly and inspection report for the pumps from the second ESP.
*See* Transcript of January 14, 2009 Hearing, at 87-93, and Defendant's Hearing Exhibit A-30.

but our experts would be in a better position because they'd have the detailed
analysis that they don't –

*See* Transcript of January 14, 2009 Hearing, at 176 and 180.[14]  Under the circumstances,

Plaintiffs are requesting that the district court give an adverse inference instruction at trial.

Second, the Plaintiffs seek an order prohibiting the Defendant from calling any
witness who would testify that they examined the ESPs and that the ESPs (or
component parts) were in good working condition.  Third, the Plaintiffs seek an
order prohibiting the Defendant from relying upon the ESPs' condition after being
pulled from Well 44-5 to opine on the condition of Well 44-5.  Finally, the
Plaintiffs seek attorneys fees generating in litigating this motion.

*See* Plaintiffs' Motion to Impose Sanctions, at 11.

In the absence of bad faith, however, the court cannot impose a dispositive sanction or

give an adverse inference instruction at trial.  Again, I do not find that the factual record supports

Plaintiffs' claim of bad faith and, therefore, must deny their motion to the extent that it seeks an

adverse instruction.

"Spoliation sanctions serve a remedial function by leveling the playing field or restoring

the prejudiced party to the position it would have been [in] without spoliation."  *Mosaid*

*Technologies Inc. v. Samsung Electronics Co.*, 348 F. Supp.2d 332, 335 (D.N.J. 2004).  *Cf.*

*Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (spoliation sanctions are

intended to "level the evidentiary playing field," as well as penalize the offending party).  In

striving to "level the playing field," there must be some reasonable relationship between the

sanction imposed and the prejudice actually suffered by the moving party.  *See Larson v. Bank*

*One Corp.*, 2005 WL 4652509, *14 (N.D. Ill. 2005).  *Cf. In re WRT Energy Securities Litigation*,

---

[14]Mr. Woodard has conceded that if the second ESP had been preserved after its return to
Casper, Plaintiffs would be in a position "to know if it was damaged" and "could run tests on it."
*See* Transcript of January 14, 2009 Hearing, at 99.

246 F.R.D. at 200 ("in the process of leveling the playing field, care must be taken not to tilt it too far in favor of the party seeking sanctions.").

In a non-spoliation case, the Tenth Circuit has held that the trial court should weigh several factors in determining an appropriate sanction: (1) the degree of actual prejudice to the moving party; (2) the amount of interference with the judicial process; (3) the culpability of the non-moving party; (4) whether the court warned the party in advance that a dispositive sanction would be likely for non-compliance, and (5) the efficacy of lesser sanctions.  *See Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992).  *See also Gates Rubber Co. v Bando Chemical Industries, Ltd.,* 167 F.R.D. 90, 101 (D. Colo. 1996).[15]

Plaintiffs' request for non-dispositive sanctions implicitly rests on the assumption that an inspection of the second ESP would have revealed equipment defects that caused the failed well tests.  Yet, as the court noted in *In re WRT Energy Securities Litigation*, 246 F.R.D. at 197, the imposition of severe sanctions requires a showing that the lost information would have been favorable to the moving party.  The record presently before the court does not permit that finding. While I am not prepared to discount or discredit Plaintiffs' assumptions as to the condition of the second ESP, the court cannot impose sanctions on speculation alone.

Moreover, if spoliation sanctions are intended to ameliorate prejudice, the court must acknowledge the extent to which the parties currently enjoy a level playing field.  It appears that neither party's retained experts had an opportunity to inspect the second ESP prior to preparing their Fed.R.Civ.P. 26(a)(2)(B) disclosures.  *Compare Bankston v. Wal-Mart Stores, Inc.*, 2008

---

[15]Where a dispositive sanction is not at issue, only the first three factors are applicable. *See Markham v. National States Insurance Co.*, 2004 WL 3019308, *12 (W.D. Okla. 2004).

WL 450575, *4 (M.D. Ga. 2008) (while acknowledging that an expert's testimony about physical evidence is often the most reliable and convincing method of proving or disproving a claim, concluded that any prejudice from the spoliation of evidence was diminished as "it appears that no expert for either party ever examined the missing physical evidence") and *Rev 973, LLC v. Mouren-Laurens*, 2009 WL 273205, *3 (C.D. Cal. 2009) (in denying defendants' motion for spoliation sanctions, noted that the lack of physical evidence prejudiced each side equally).  Both sides have access to the Inspection and Pull Reports relating to the first and second ESP, as well as Mr. Woodard's Rootcause Analysis Report on the first ESP and the documentation pertaining to Plaintiffs' experience with submersible pumps leased from ESP Wood Group and Schlumberger.  Absent evidence to the contrary, the court will also presume that Plaintiffs' employees at Well 44-5 had an opportunity to observe the exterior appearance of the second ESP when it was removed from the well on July 17 and 20, 2006.  I find no justification for imposing a sanction that would exclude opinion testimony at trial that relies or is based upon the foregoing information.[16]

I do find that Plaintiffs motion has merit to the extent that it seeks to exclude, as a sanction, any testimony "that the [second] ESP (or component parts) were in good working condition."  Nothing in the record before this court indicates that Centrilift employees made any attempt to test the second ESP as a complete working unit or determine the unit's "working condition" after its return to Casper on July 20, 2006.  Certainly, no one bothered to prepare a Rootcause Analysis Report.  Having failed to preserve the second ESP as a complete unit,

---

[16]In reaching that conclusion, the court offers no views on the applicability of Fed.R.Evid. 701 or 702 as those Rules relate to such opinion testimony.

Centrilift should be precluded from offering at trial an opinion as to the "working condition" of the complete unit. Plaintiffs should also be permitted to tell the jury that Centrilift failed to preserve the second ESP as a complete unit after July 20, 2006.

Testimony concerning discrete components within the second ESP is more problematic. Centrilift's records indicate that the motor from the second ESP was tested by Michael Niegisch on or about May 31, 2007 and then sent to a new job. Subsequent re-use of the motor is some circumstantial evidence as to its working condition. I am not aware that Mr. Niegisch was ever deposed in this case or that he has ever been asked to explain his evaluation process and decision to re-use the motor. The record indicates that the seal from the second ESP was scrapped, but that decision does not automatically imply that the seal was defective. Plaintiffs' counsel argued that his clients do not know why Centrilift scrapped parts from the pumps removed from the second ESP. According to Plaintiff's counsel, "[n]obody can answer the question why." It would be more accurate to say Plaintiffs cannot answer that question, in part, because they elected not to depose the Centrilift employees in Casper who were directly involved in the disassembly of the pumps and the decision to scrap some of those parts. *See* Transcript of January 14, 2009 Hearing, at 176-77. At this point, the court is not convinced that "leveling the playing field" as to the working condition of individual components requires the exclusion of testimony. However, for purposes of "leveling the playing field," the court will re-open discovery for the limited purpose of allowing Plaintiffs to depose those Centrilift employees who were directly involved in the evaluation and disposition of the component parts (seal, motor and pumps) from the second ESP. Those depositions will take place in Denver, Colorado and Centrilift will be responsible for any costs associated with the deponents' appearance in Denver.

I will not grant Plaintiffs' motion to the extent that it seeks to preclude Defendant from "relying upon the ESP's condition after being pulled from Well 44-5 to opine on the condition of Well 44-5." Again, I presume that Asher employees were present when the second ESP was pulled from Well 44-5 and observed the "ESP's condition." I do not believe that Defendant should be precluded from offering opinions based upon the outward appearance of the second ESP on those dates. However, Defendant should not be permitted to offer opinions as to the condition of Well 44-5, to the extent those opinions are based upon a subsequent inspection of the individual component parts of the second ESP, since Plaintiffs were not afford the same opportunity to inspect.

Monetary sanctions are appropriate in spoliation cases as

an award of costs serves both punitive and remedial purposes: it deters spoliation and compensates the opposing party for the additional costs incurred. Such compensable costs may arise either from the discovery necessary to identify alternative sources of information or from the investigation and litigation of the document destruction itself.

*Turner v. Hudson Transit Lines*, 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (internal citations omitted). I find that Defendant failed to comply with its well-established obligation to preserve relevant evidence. Plaintiffs are entitled to an award of reasonable fees and costs incurred conducting the limited discovery permitted by this Order. Accordingly, I will require Centrilift pay the court reporter costs associated with the depositions permitted by this Order. I will also require Defendant to pay $5,000 to defray attorneys fees incurred by Plaintiffs in taking those additional depositions. Given the partial success achieved by Plaintiffs in filing this motion, I will not impose any other monetary sanctions.

**CONCLUSION**

Accordingly, for the foregoing reasons, Plaintiffs' Motion Pursuant to this Court's Inherent Power to Control Litigation to Impose Sanctions for the Defendant's Spoliation of Evidence (doc. # 64) [filed under seal] is GRANTED IN PART and DENIED IN PART. The court finds that Defendant failed to take appropriate steps to preserve evidence that it knew or should have known was relevant to reasonably foreseeable litigation. However, the court does not find that Centrilift acted willfully or in bad faith and, therefore, Plaintiffs' request for an adverse inference instruction is denied.

The court does find that lesser sanctions are warranted based upon Defendant's failure to preserve relevant evidence. Accordingly, Defendant is precluded from offering at trial opinion testimony as to the "working condition" of the second ESP as a complete unit on July 17 and 20, 2006. Defendant is also precluded from offering at trial opinion testimony as to the conditions inside Well 44-5 to the extent those opinions rely upon information derived from Centrilift's disassembly and inspection of the component parts of the second ESP. Based upon the evidence presently before the court, I do not find at this time that Plaintiffs have presented a sufficient evidentiary record to bar at trial the introduction of opinions regarding the working condition of the component parts from the second ESP. I will permit Plaintiffs to re-open discovery for the limited purpose of deposing in Denver, Colorado those Centrilift employees who were directly involved in the evaluation and disposition of those components.[17] I will also require Defendant

---

[17]It is important to note that the findings incorporated in this Order are based upon the record presently before this court. I have concluded, in light of that record, that additional sanctions are not justified at this time. I do not preclude the possibility of additional evidentiary rulings or sanctions at a later stage if warranted by future discovery.

24

to bear fees and costs as set forth in this Order.

Dated this 12th day of May, 2009.

BY THE COURT:


 s/ Craig B. Shaffer
United States Magistrate Judge